Turn to the last case on our day calendar, Hao-Yin Tso et al. v. HSBC Holdings plc. May it please the Court. Good morning, Your Honours. My name is Hung Ta. I appear on behalf of the plaintiffs' appellant and with me are my colleagues Joo-Yeon Kim and Natalia Williams. Your Honours, there are three key facts which in our submission dispose of the legal issues in this case, in this appeal. Fact one, over the course of a decade, HSBC was responsible for funneling $8.9 billion to Bernie Madoff Securities Ltd. in New York, representing 33% of all monies that went to Bernie Madoff. A lot of money. Correct, that's right, Your Honour. And for directing this money, HSBC earned a lot of fees, tens of millions of dollars in fees as the administrator and the custodian. To facilitate this enterprise, HSBC used New York's bank accounts to direct money to Bernie Madoff. In communications received by our client, we were specifically instructed to wire money to a US dollar bank account held by HSBC Bank USA, one of the defendants in New York. Prior to HSBC Bank USA, it was in fact Citibank, N.A., operating in New York where we were supposed to wire money in US dollars. This use... The choice for that is the Madoff fund was doing business in New York so the money had to get into New York, had to get into dollars, right? That's correct, Your Honour. Did it come in in other currencies and therefore had to be exchanged or not? That I do not know, Your Honour. But we do know that it did come in US dollars through, as I said, HSBC Bank USA and prior to HSBC Bank USA, Citibank, N.A., in New York. And you're a correspondent bank of relationships, is that it? That's correct, Your Honour. And what Roush Aid, the New York Court of Appeals decision, says is that this is exactly, this use of New York bank accounts is precisely the type of deliberate, volitional and repeated contact with New York that constitutes the transaction of business for purposes of CPLR 302A1. And in fact, in Roush... That's only as to the custodian and administrative defendants, isn't it? That is correct, Your Honour. Four of those, right? That's right. The sub-custodian, the custodian administrator and the sub-administrator, correct, Your Honour. Because they're the ones who directed the deposits into correspondent accounts in New York which then funded purchase of BLNIS, I've seen those letters so many times in the last three years, stock, right? That is correct, Your Honour. Go ahead. And in fact, in Roush Aid, the facts were weaker than the facts we have here. In Roush Aid, for example, there were only $4 million in transfers in total. It was a third-party correspondent bank account, not an HSBC Bank USA, one of the defendants' bank accounts. And it was actually at the instruction of the clients, the money launderers. The same thing is true in Lecce Bank, right? That is correct, Your Honour. The client was the one who directed the correspondence. Correct. And here, we were being instructed by HSBC, the defendants, to wire money in US dollars. So we think the facts here are stronger. And we think, Your Honour, that the facts that we have here are sufficient to create personal jurisdiction over the administrator and custodian defendants. But in addition, with respect to the custodian defendants, there's an additional ground for the fact that they had a sub-custodian relationship with Bernie Madoff Securities. The contracts that existed with regard to the sub-administrators, is that it? It was actually a sub-custodian agreement between the custodian defendants and Bernie Madoff Securities. So that's actual contractual activity in New York? That's right. And also, we would say that through their agent, Bernie Madoff Securities Limited, they were committing torts in New York. And I'll just make one quick point on that, Your Honour. And that is, this is not a case where HSBC did not know of or consent to what Bernie Madoff Securities was doing in New York. I mean, there was a sub-custodian relationship. And pursuant to that agreement, HSBC turned over billions of dollars to Bernie Madoff. In other words, the sub-custodian agreement was being performed. And so, this is not like one of those cases where an agent comes into New York and the principal has no idea what the agent is doing. In fact, no idea that there is an agent acting on her or his behalf. Are you going to? I'm interested in standing. Let me get to that point. It seems to me that the standing is a more preliminary issue. Let me address that point. And am I right that you agree that if I'm not? Am I right that you agree that if British Virgin Islands law does agree, you do not have standing? Sorry, I didn't hear the last part. Am I right that you agree that if British Virgin Island law does apply and regulates this relationship or determines the law that is the applicable law to this relationship, that you do not have standing? That these are claims of the corporation, all of them? Not precisely, Your Honour. I think there's an anterior question. And the anterior question is, what exactly were the claims that we brought? And that's a factual question. It's a factual characterization question. Did we bring direct claims or did we bring derivative claims? Well, that's a law question, I think, in terms of understanding what you've pledged. But let's start over again. So, it's the law of the forum decides what choice of law, right? Sorry, Your Honour. So, New York choice of law decides. Why doesn't New York law say that British Virgin Island has the most significant context? These are about activities of the corporation, are they not? Is there any allegation of a separate independent relationship or obligation between any of these defendants and any of the plaintiffs under New York law that would allow under New York law to be an exception to the internal governance prong of the choice of law? Well, Your Honour, I think the answer to that question is the BVI law only applies if you determine preliminarily that this is a matter of internal affairs. And that's the point. That's why I said there's an anterior question, because we're asserting direct claims against external parties. Well, you're attempting to, but the question is whether they really are direct claims against the internal body or whether you're really talking about bad management or mismanagement of corporate funds. And that's — you're correct, and that's what this record focuses on, Your Honour. But we have a — we have a negligent misrepresentation claim, and that is a claim where we said that we were induced to put — let me back — Go ahead. Go ahead. Let me backtrack a bit, Your Honour. The critical point here, the critical fact, too, is that between 2002 and 2008, our clients made eight separate purchases of shares in Jomez World Fund. This wasn't a situation where our client made an initial purchase and then sat and hold and said, oh, in 2008, we've lost a whole bunch of money. They made eight separate purchases. In other words, our claims are for inducement. We purchased and were induced to purchase because we received portfolio summary reports, we received financial reports, we received statements, all of which told us that, look, your net asset values are X, and we relied on those, and we specifically plead that in our negligent misrep claim. We specifically plead that in our breach of fiduciary duty claim, that because — and in reliance on the misrepresentations, we were induced to purchase and retain our investments. We say that explicitly in our — in the counts that we pled in the complaint, Your Honour. So I — so my submission is, Your Honours, if our claims are direct against external parties, then the question of standing never ever arises because we're not — this is not an internal affairs issue. We're not suing boards of directors. We're not suing officers of Jomez. We're suing external parties. Well, you are suing claiming that they shouldn't have invested in burn-off — made-off investment securities, burn-LMER investment securities. I mean, so you are — there are some mismanagement claims that you have. And if there are mismanagement claims, Your Honour, and if the mismanagement claims are not viable, what the Court should have done was simply just excise — dismiss the mismanagement claims. And that's what, in fact, this Court held in the Newman decision, where this Court said, look, to the extent that you have mismanagement claims that we're not going to allow, we are not going to allow those, but the direct inducement claims are permissible, and we'll let those go forward. And that's what the District — the Court of Appeals, Second Circuit said in a footnote in the Newman decision. Your Honours, just — I know my time's about to run out, but just let me make one quick point. It has run out. Oh. Although you have — you've reserved some time. Okay. Thank you, Your Honours. Good morning, Your Honours. Tom Maloney on behalf of the HSBC defendants. And in the Court below, there are really three rationales for the decision, Your Honour. One is the personal jurisdiction opinion, which applies to the eight foreign HSBC defendants. The second one is the standing opinion, which the Court below only analyzed in the context of the U.S. custodial defendant. And the third is the statute of limitations defense, which the Court below only analyzed in the context of the U.S. defendant. But I would posit, as we put in our brief, all three defenses would apply to all the HSBC defendants. So in some ways, the path of least resistance is the third defense, which is the statute of limitations, which is that they waited six and a half years after Madoff's fraud was uncovered to file this lawsuit. They did not plead any type of toll in their complaint, but they've argued in their brief that there should have been a fiduciary toll. They have not alleged facts that would give basis for a fiduciary claim, and certainly the negligent misrepresentation claim under which they came into the fund would not be a fiduciary claim. So therefore, the fiduciary toll would not apply. But even if the fiduciary toll did apply, it would not, it would have ended when Madoff's fraud was uncovered. Certainly at that point, no one in the world thought Madoff was acting as their fiduciary, and nobody in the world thought that HSBC was acting as their fiduciary for the subfund in Madoff, which was now taken over by Mr. Picard. So even if we lost on our argument, and I think we win on both those arguments, on a third argument, only a fiduciary claim would be affected, and they basically have conceded they don't have standing to bring anything other than potentially negligent misrepresentation claim. And even if we lost on that argument, they don't have standing to bring a claim for equitable relief, not monetary damages, which is the only remedy they could get. So honestly, at least by the district court, this one is the most easiest one to see that the case goes away. I would also benefit you most, because that would be a decision on the merits, and the case couldn't be brought in a jurisdiction where there is personal jurisdiction. Yes, there is some benefit to being in that. Now let me talk about what I think are the more complicated, interesting questions for the appeal, which are, if I can, though they take time, is the personal jurisdiction question. I think that the context by the HSBC defendants were not purposeful in the sense that they all were collateral to this contractual relationship that the service providers have with the funds. They were purposeful by the funds, certainly, but we were just carrying out their purpose, and therefore they were not purposeful. That would be my first argument. My second argument is that I think the court's move— The only way they could invest in Bernard Madoff Investment Securities was to come to New York, and they didn't have branches here, and so they had to have correspondent bank relationships, didn't they? Correct. So, I mean, the other two cases from the New York Court of Appeals, like the certified questions on the Leachy case and then the Rashad case, there's this nefarious connection of the bank, but I don't know that, in Rashad, ultimately, that's what the majority went off on, and seemed to say in Leachy, too. It seemed to say, look, New York is a marketplace, and if you're regularly in New York doing dollar exchanges, then you're transacting business here because this is the marketplace for dollars. It differentiated Amigo Foods because in Amigo Foods, it was serendipity that they ended up picking the one bank account where the deposit was made, and it really had nothing absolutely to do with any kind of regular, purposeful activity. Do I—you know, do I agree with that? Well, the dissent had a lot of problems with it, but they didn't have the extra vote they needed, and so that's the law in New York. Now, whether that's constitutionally suspect or not is another matter, but— That's the second prong—and the third prong of this, but— Which is why I want to ask you about standing. Right, which is why I understood you when you went to standing, Your Honor, but let me just say that—and I did argue before you when you were in the Court of Appeals when I represented the superintendent of banks at BCCI, so I think—so I think maybe the decision would have been written differently if you were still there. A long time ago. A long time ago. But the—90 percent of all transactions are done in U.S. dollars. Worldwide, we'll be the court for every single commercial dispute in the world. Well, whether it's the policy or not is another matter, but this— So I think that you could read that opinion, and I suggest maybe the Court of Appeals has got a chance to think about it some more, might read that opinion as saying it's when the bank is acting for its purpose. That makes it purposeful. In both those cases, the bank had a purpose. In Lychee, the bank's purpose was to advance a cause of Hamas, which they allege the bank believed in. In Rashad, the bank's purpose was to involve a scheme that they were integrally part of. What about here? The bank's purpose was to invest in Bernard Madoff? No, the bank was servicing this fund in the BVI. If Laguna decided they were going to invest in some other German offshore fund, there would have been a German HSBC affiliate involved in. For example, if I go to C-Bank, representing Cleary, and I say, send money to our Korean bank—to your corresponding bank in Korea, because I have an office in Korea—has the bank decided that it wants to subject itself to Korean law because there's a corresponding bank in Korea? I don't think so. It's not serving its purpose. It's serving my purpose. But I think the second argument is a clearer argument, which is I think the constitutional overlay has moved the second argument much closer to proximate cause, if not there. And sending the money there was not the proximate cause of the fraud. Bernard Madoff stealing the money was a but-for cause. The money never got to New York. Quite clearly, it wouldn't have been stolen. But it wasn't the proximate cause of the problem. The proximate cause of the problem was Madoff stole the money. That was the proximate cause of the problem. Therefore, I don't think it's constitutional, and I don't think even under the second part of the test, where they're looking for a substantial nexus or some connection to a cause of action, these cause of actions do not relate to the fact that we had a corresponding bank in New York. The corresponding bank in New York worked fine. If Madoff had not been stealing the money, this corresponding banking relationship would have been absolutely perfect. The money went in. The money went out. There wasn't a single flaw in that. And if Bernard Madoff had been a legitimate business, this corresponding banking, there'd be no question about it. The problem was you were sending the money to a crook, and that crook was the proximate cause and had nothing to do with the corresponding bank. How about standing? On standing, Your Honor, I think they basically conceded that BVI law applies, and they basically said the only claim they have potentially is this claim for negligent misrepresentation. They didn't really plead that we caused them to invest in this fund. If you actually look at the facts of the complaint, and I'm looking at what they actually did in 60-D and 60-A, at page 832 in the record, they pled in 60-A that there was a prospectus in 2007, and they claimed in 60-D that they received some reports in October 2005, October 2006, and December 2007. They told you already that their investment started in 2002. So the idea that we as administrator, that we're appearing, remember, we're not appearing as the investment manager. We're not appearing as the fund promoter. We're the administrator and custodian. And based on my experience, I've never, in 40 years on Wall Street, I've never heard anybody investing in an investment strategy based on who the custodian is. But putting that aside, their pleadings contradict that. Their pleadings show that they made these investments when Citibank was the person they were dealing with, which is what he just told you, when he stood up before you, and their pleadings say that they didn't even know about HSB's involvement until three years after they made these investments. And what was the nature of our, quote, unquote, negligent misrepresentation? We sent them the company's information, which we were entitled to do, and it wasn't our information. And under our contracts, if you look in the record, and I have a citation for you, Your Honors, the contracts specifically provide that we're allowed to rely on the company's information and to pass that information on. That's in A-90 and A-117 in the record are the contracts that say we can rely on the manager and the company's information, and we have no independent duty to verify. That's different than Amwar. In Amwar, Citgo undertook to verify information independently and also verified to take whatever action necessary to protect the property. And Judge implied a fiduciary duty. Here, we had a, we just had a contractual relationship where we're filling out a very ministerial custodial function, which is typical, but funds and custodians actually do. And they were not the ones, they were not the ones making this investment. They were not the ones supposedly supervising the investments. They were the ones to make sure that the trains ran back and forth, the cash came back and forth, and that based on the manager's reports were accurate. They did all of that fine. And if there's a problem with it, then it's the funds who have this contractual relationships who have standing to ask that question. And it's BVI law that governs because there's no New York contact here, as we heard, other than as potential negligent misrepresentation claim, which has no basis whatsoever. Thank you, Your Honor. Your Honor, let me just quickly address the standing issue. And I just want to make sure that we're clear about what we're arguing. Our argument is that these claims were direct claims. They were not derivative claims. And then with respect to direct claims for inducement, the defendants never submitted any evidence to the district court as to what BVI law was with respect to direct inducement claims. The EORIO declaration was exclusively focused on what BVI law was with respect to derivative claims for diminution in value. That's not what we're arguing. So once you determine that we're suing for direct inducement claims, then the question is, have the defendants established an actual conflict of laws? In the absence of any law about what the direct inducement claim law under BVI law was with respect to direct inducement claims, the district court should have just simply applied New York law. Do you agree with this character that we should be looking at 831, 32, 33, the claims set forth there in those paragraphs? I'm not sure. Paragraph 60, 61, 62, 63, et cetera. Look there for what purpose, Your Honor. Those are your negligent inducement claims or misrepresentations? Not just that, Your Honors. If you look at the counts that we plead, we've got a lot of allegations about what the misrepresentations were in terms of the net acts of values that were provided to us and our inducement and what we were induced to do in the counts as well. Where do I look there? Oh, Your Honors, that would be, for example, A60, A667. Speak into the microphone. Sorry. A667, paragraph 197, A68, paragraph 200, for the negligent misrepresentation claims, it would be paragraph 225 on page A73 all the way through to paragraph 232 on page A74. And Your Honors, can I just quickly say something about the fiduciary duty claim? Go ahead. This is a situation where the Hermes World Fund in which our clients invested was a shell vehicle. It had no brains, and so the people who actually dealt with our clients were the administrators and the custodians. They were the face of the investment at all stages of the life cycle of the investment. For example, in the solicitation to our clients, it was HSBC who appeared on the prospectus. When they told us how to invest money and where to wire the money, it was HSBC who instructed us. When they calculated net asset values, it was HSBC on the portfolio summary reports that we got. HSBC was prominently displayed on the top right-hand corner. When it was time to redeem money, it was HSBC. And they had a lot of discretion and a lot of power, and they formed judgments as to whether to pay assets, to pay out from the bank accounts they could appoint agents, and they contacted with us at all stages. And we say that the fiduciary relationship with HSBC never terminated until August 2014. We explicitly alleged that in the complaint, and that was because they were still communicating with our clients as of August 2014. Very well argued by both sides, and we're grateful. We're adjourned.